UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>CYNTHIA BALLENGER and<br>CHRISTOPHER PRICE,<br><br>Defendants. | Criminal Action No. 21-719 (JEB) |

### MEMORANDUM OPINION

Defendants Cynthia Ballenger and Christopher Price face charges for allegedly participating in the insurrection at the United States Capitol on January 6, 2021. With trial looming, they now move for a change of venue, claiming that they cannot receive a fair and impartial trial in the District of Columbia. As Defendants advance no arguments that have not already been considered and persuasively rejected in other cases in this district relating to January 6 defendants, this Motion meets the same fate.

**I.   Background**

Defendants are charged by Information with four misdemeanor counts: i) Entering and Remaining in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(1); ii) Disorderly and Disruptive Conduct in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(2); iii) Disorderly Conduct in a Capitol Building or Grounds, in violation of 40 U.S.C. § 5104(e)(2)(D); and iv) Parading, Demonstrating, or Picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G). See ECF No. 38 (Information). These charges relate to their role in the January 6 insurrection. According to the Affidavit in Support of the Complaint

1

in this case, Defendants traveled from their home in Maryland to attend the so-called "Stop the Steal" rally, ultimately joining others in breaching both the restricted grounds and the building of the Capitol during the insurrection. See ECF No. 1–1.

They were arrested in Baltimore on August 9, 2021, see ECF Nos. 6, 7, and were subsequently charged by Information with the foregoing counts. They now move to transfer venue to the Northern District of West Virginia, arguing that a District of Columbia jury is presumptively prejudiced against them. See ECF No. 57 (Def. Mot.).

**II.     Legal Standard**

Criminal defendants have a constitutional right to trial by "an impartial jury of the State and district wherein the crime [was allegedly] committed." U.S. Const. amend. VI. Federal Rule of Criminal Procedure 21(a) nonetheless requires a court to "transfer the proceeding against [the] defendant to another district" when "so great a prejudice against [that] defendant exists in the transferring district that the defendant cannot obtain a fair and impartial trial there." Where "extraordinary local prejudice will prevent a fair trial," such transfer is a "basic requirement of due process." Skilling v. United States, 561 U.S. 358, 378 (2010) (quoting In re Murchison, 349 U.S. 133, 136 (1955)).

"[A]dequate *voir dire* to identify unqualified jurors" is the primary safeguard against jury prejudice. Morgan v. Illinois, 504 U.S. 719, 729 (1992). "Except in the most extreme cases, . . . a pre-voir dire conclusion must depend solely on the subjective reaction of the judge who reaches it." United States v. Haldeman, 559 F.2d 31, 62 (D.C. Cir. 1976). "[I]f an impartial jury actually cannot be selected, that fact should become evident at the voir dire." Id. at 63.

"A presumption of [jury] prejudice" prior to *voir dire* "attends only the extreme case." Skilling, 561 U.S., at 381. Presuming prejudice in advance of *voir dire* should occur only in

cases with "trial atmosphere[s] . . . utterly corrupted by press coverage," and "juror exposure to . . . news accounts of the crime" does not "alone presumptively deprive[] the defendant of due process." Id. at 380. "[P]retrial publicity, even if pervasive and concentrated, cannot be regarded as leading automatically and in every kind of criminal case to an unfair trial." Neb. Press Ass'n v. Stuart, 427 U.S. 539, 565 (1976).

The Skilling court identified three principal factors to which courts should look in order to determine whether prejudice should be presumed: the "size and characteristics of the community," the presence in news coverage of a "confession or other blatantly prejudicial information of the type readers or viewers could not reasonably be expected to shut from sight," and the time between the alleged offense and jury selection and any attendant change in "the decibel level of media attention." 561 U.S. at 382–83.

**III.    Analysis**

Defendants argue that the factors identified in Skilling weigh in favor of transfer because i) "the amount of pre-trial publicity imputing collective guilt and providing prejudicial characterization [here] is massive and unprecedented," Def. Mot. at 2;  ii) statements by "local politicians" and others have contributed to this imputation and to these characterizations, as have those by the Government and the judiciary, id. at 8, 17; and iii) "the circumstances involve highly partisan bias." Id. at 18.  They further contend that survey evidence confirms that the District of Columbia jury pool is prejudiced against January 6 defendants. Id. at 19.  "A transfer is [therefore] warranted because . . . the substantial local impact, the partisan divide, and negative prejudgment in the District of Columbia is higher than [in] other states." Id. at 22.

No court in this district has yet granted a January 6 defendant's motion to transfer prior to *voir dire*. See United States v. Williams, No. 21-618, ECF No. 63 (Order Denying motion to

3

Transfer) at 2 (D.D.C. Aug. 12, 2022) (collecting cases). While "each case must turn on its special facts," Marshall v. United States, 360 U.S. 310, 312 (1959), Defendants offer no arguments to distinguish their case from those others in this district or to explain why those other decisions are erroneous. The Court nevertheless discusses each of Defendants' arguments under the applicable Skilling factors to explain anew why the same outcome obtains here.

        A.      Community Size and Characteristics

Ballenger and Price first maintain that an impartial jury cannot be empaneled in the District of Columbia because of the small size of the judicial district, the high number of residents here who work for the federal government, the unique impact that the insurrection had on many of the city's citizens, and the partisan composition of D.C.'s voters.

While Defendants correctly point out that the District is smaller than Houston, where the Skilling court found no presumption of prejudice was warranted, Washington is hardly a one-stoplight village, and it is much larger than districts in the handful of cases in which prejudice has been presumed. Skilling, 561 U.S. at 379 (describing small-town setting where presumption warranted). Indeed, the District is larger than districts where no such prejudice was presumed. Id. at 382 (citing Gentile v. State Bar of Nev., 501 U.S. 1030, 1044 (1991) (prejudice unlikely in smaller district than District of Columbia)); Mu'Min v. Virginia, 500 U.S. 415, 429 (1991) (no presumption of prejudice warranted in smaller district than District of Columbia). "Given [the district's] large, diverse pool of potential jurors, the suggestion that 12 impartial individuals could not be empaneled is hard to sustain." Skilling, 561 U.S. at 382.

Defendants rejoin that "the impact of the events of January 6 on the residents of the District of Columbia" was "far more widespread . . . than the [impact of the] conduct at issue in Skilling" on Houston. See Def. Mot. at 24. To support this assertion, they first point out that "a

4

huge proportion of District of Columbia residents either work for the federal government themselves or have friends or family who do." Id. Yet, as the Government rightly counters, "Defendants do not explain how merely being employed by the Federal Government would render a person incapable of serving as an impartial juror." Gov. Opp. at 7. Indeed, "many [federal employees] were neither directly nor indirectly affected" by the attack, which "was not aimed at the Federal Government in general, but specifically at Congress' certification of the electoral vote." Id. Vague insinuations that federal employees are biased by their employment represent "exactly the kind of conjecture that is insufficient to warrant transfer prior to jury selection." United States v. Bochene, 579 F. Supp. 3d 177, 181 (D.D.C. 2022) (denying transfer in January 6 case). Even if such bias could be assumed, twelve impartial jurors could still be drawn from those hundreds of thousands of District residents who do not work for the federal government.

      Defendants further assert that this Court should presume that District residents are biased because of their "significant and unique connections" to the events of January 6. See Def. Mot. at 26. Many potential jurors, however, have no such connection to those events, living and working in parts of the city that were unaffected by the attack or the efforts to respond to it. In any case, a fair trial is possible even if an event had a significant impact on a community. See In re Tsarnaev, 780 F.3d 14, 15 (1st Cir. 2015) (Boston Marathon bombing); Skilling, 561 U.S. at 384 (Enron collapse); United States v. Yousef, 327 F.3d 56, 155 (2d Cir. 2003) (1993 World Trade Center bombing); United States v. Moussaoui, 43 F. App'x 612, 613 (4th Cir. 2002) (September 11, 2001, attacks, including on Pentagon). "Although . . . widespread community impact necessitate[s] careful identification and inspection of prospective jurors' connections" to the events of January 6, "*voir dire* [is] well suited to that task." Skilling, 561 U.S. at 384.

5

Defendants last gesture at the partisan composition of the District as a putative source of prejudice. The fact that "an overwhelming number of District of Columbia residents" voted for the Democratic candidate, see Def. Mot. at 28, is not "at all pertinent to venue," as the D.C. Circuit explained in a case related to the Watergate scandal. Haldeman, 559 F.2d at 64 n.43. "The law assumes that every citizen is equally interested in the enforcement of the statute enacted to guard the integrity of national elections, and that his political opinions or affiliations will not stand in the way of an honest discharge of his duty as a juror in cases arising under that statute." Connors v. United States, 158 U.S. 408, 414 (1895). *Voir dire* is sufficient to screen out those jurors who cannot put their partisan allegiance aside and to ensure that Defendants are tried by "an unbiased jury capable of basing its verdict solely on the evidence introduced at trial." Haldeman, 559 F.2d at 70. To hold otherwise would be to assume that no politically charged case could be fairly tried here.

The polling submitted by Defendants does little to undermine this conclusion. They insist that a telephonic poll conducted by Select Litigation proves that prejudgment is higher in this district than elsewhere. See Def. Mot. at 19–22. As a preliminary matter, courts have generally rejected the notion that such polling can serve as a substitute for *voir dire*. In rejecting the position that a survey similar to the one here mandated transfer, the Haldeman court opined:

> It is our judgment that in determining whether a fair and impartial jury could be empanelled the trial court did not err in relying less heavily on a poll taken in private by private pollsters and paid for by one side than on a recorded, comprehensive voir dire examination conducted by the judge in the presence of all parties and their counsel pursuant to procedures, practices and principles developed by the common law since the reign of Henry II.

559 F.2d at 64 n.43.

Even if polling could serve as a substitute safeguard for *voir dire*, the data presented by Defendants would not counsel transfer. Defendants ask this Court to transfer their case to the Northern District of West Virginia, but the survey they proffer compares this district to the Atlanta Division of the Northern District of Georgia. See Def. Mot. at 20. The Court cannot conclude, on the basis of such a survey, that transfer to Defendants' preferred venue would make selecting an impartial jury easier.

To the extent that the poll can be used for general comparisons of this district with others, it still fails to establish pervasive prejudice here. For example, the difference in the percentage of respondents in each district indicating the highest level of perceived media exposure was within the margin of error, and only relatively modest differences exist between the percentage of respondents indicating other levels of exposure across the districts. See Gov. Opp. at 19.

Defendants point out that 71% of those polled in the District of Columbia responded, "Guilty" when asked for their "[o]pinion of whether people arrested for Jan 6 activities are guilty or not guilty of the charges brought against them." Def. Mot. at 20. They buttress their assertion of widespread prejudgment with the poll's findings on the high number of District residents who gave unflattering characterizations of the participants in and purposes of the January 6 insurrection. Id. at 21. As the Government notes, however, the belief that most people arrested for crimes are guilty is widespread; jurors who would nevertheless infer the guilt of a particular defendant can be screened out with *voir dire*. See Gov. Opp. at 21. Indeed, the survey indicates that nearly half of those surveyed responded, "Depends" or "Don't know/Refused" when asked specifically about the guilt or innocence of January 6 defendants in the context of a criminal trial. Id. Because of the general presumption against supplanting *voir dire* with polling evidence and because the poll submitted by Defendants fails to establish prejudice even if taken at face value,

the Court need not reach the various potential methodological problems with the survey that the Government discusses. See Gov. Opp. at 22–24.

In sum, the size and characteristics of this district do not merit a presumption of prejudice against Defendants. Despite their generalizations about the District of Columbia jury pool, the feelings towards them by many of the District's potential jurors are best captured by Don Draper's now-memetic retort: "I don't think about you at all." Mad Men: Dark Shadows (AMC television broadcast May 13, 2012).

### B. Pretrial Publicity

The second factor to weigh in deciding about prejudice looks at whether pretrial coverage features a "confession or other blatantly prejudicial information of the type readers or viewers could not reasonably be expected to shut from sight." Skilling, 561 U.S. at 382. Defendants cite a potpourri of such purportedly prejudicial coverage, including statements by politicians or other figures linking the insurrection to white supremacy, characterizing it as domestic terrorism, and so on. See Def. Mot. at 2–18. They contend that such pretrial publicity constitutes the "imput[ation] of collective guilt and providing prejudicial characterizations." Id. at 2.

None of the coverage about which Defendants complain is "as inherently prejudicial nor as unforgettable as the spectacle of [a defendant's] dramatically staged and broadcast confession." Haldeman, 559 F.2d at 61. For prejudice to be presumed, it is not enough that pre-trial publicity is "not kind," Skilling, 561 U.S. at 382, or that it is "hostile in tone and accusatory in content." Haldeman, 559 F.2d at 61. The Skilling and Haldeman courts held that the unflattering pre-trial publicity attending the Enron and Watergate scandals, respectively, was not of a nature meriting transfer. As in those cases, moreover, while some accounts of the

insurrection have been pointed, many have "consist[ed] of straightforward, unemotional factual accounts of events and of the progress of official and unofficial investigations." Id.

In addition, as there, much of the coverage of the events of January 6 has been national, not local, in nature. In cases involving crimes of national interest featured in coverage that is "national in reach," "a change of venue [is] of only doubtful value." Id. at 64 n.43. "The fact that there has been ongoing media coverage of the breach of the Capitol and subsequent prosecutions, both locally and nationally, means that the influence of that coverage would be present wherever trial is held." Bochene, 2022 WL 123893, at *3 (quotation marks omitted). This district's "size and diversity," moreover, "dilute[] the media's impact." Skilling, 561 U.S. at 384. Lastly, as far as the Court can tell, Defendants have not featured in local coverage this calendar year. That is not surprising given that, based on the misdemeanors with which they are charged, their roles were relatively minor.

C.   Time

The final factor to consider is the amount of time elapsed between the underlying conduct and the trial and any resultant attenuation in publicity. Nearly two years have passed since the insurrection, which is not a substantial amount of time. While "there has recently been renewed attention on the events of that day because of the widespread coverage of the congressional hearings conducted by the Select Committee to Investigate the January 6th Attack on the United States Capitol," "coverage [has] related primarily to the events of January 6 in general and the role that public officials and their advisors and campaigns may have played in bringing them about, not the particular activities of any individual defendant." Williams Order, No. 21-618, at 17–18. Relative to the media environment in the days after the attack, the "decibel level of

9

media attention [has] diminished somewhat," Skilling, 561 U.S. at 383, but the focus remains substantial. This factor therefore may be said to be in equipoise.

\* \* \*

The Court finds no reason to presume prejudice on the part of this district's venire prior to *voir dire*, the appropriate tool here for rooting out prejudice. Like defendants in other scandals or January 6 cases, Ballenger and Price can be tried fairly and impartially in the District of Columbia.

### IV. Conclusion

For the foregoing reasons, the Court will deny Defendants' Motion to Transfer Venue. A separate Order so stating will issue this day.

s/ *James E. Boasberg*
JAMES E. BOASBERG
United States District Judge

Date: October 28, 2022