**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | **Case No. 1:21-cr-719 (JEB)** |
| | : | |
| CYNTHIA BALLENGER and | : | |
| CHRISTOPHER PRICE, | : | |
| | : | |
| Defendants. | : | |

**GOVERNMENT'S OPPOSITION TO DEFENDANTS' MOTION FOR NEW TRIAL
AND RENEWED MOTION FOR JUDGMENT OF ACQUITTAL**

Defendants Cynthia Ballenger and Christopher Price renew their prior motion for judgment of acquittal, ECF No. 108, and move for a new trial, ECF No. 109.[1] The Court should deny the motions because, as the Court correctly found during the trial, there was sufficient evidence to convict the Defendants of all counts beyond a reasonable doubt. In addition, the Defendants fail to raise sufficient grounds for a new trial.

**FACTUAL FINDINGS AT TRIAL[2]**

On January 6, 2021, the United States Capitol was closed to the public. This closure was due to the COVID-19 pandemic as well as a joint session of Congress, convened for the purposes of certifying the results of the 2020 presidential election. In addition to the restriction of the Capitol Building itself, there was a perimeter around the Capitol that was also restricted. Gov't Ex. 501. This perimeter was demarcated by bicycle racks, snow fencing, and area closed signs. The Senate Wing Door of the United States Capitol is not a regularly used entrance or exit to the building. Rather, the door is only used for fires and emergencies. In order to visit the Capitol, one must be

---

[1] These motions are accompanied by legal memoranda, filed as ECF Nos. 108-1 and 109-2, respectively.

[2] As found by the Court on March 21, 2023, following a two-day bench trial.

screened by magnetometers and X-ray machines.

The joint session was presided over by Vice President Mike Pence, who is a United States Secret Service protectee. The Vice President arrived at the Capitol shortly before 1:00 PM. However, due to the riot, the Vice President, legislators, and staff were evacuated. Congress could not reconvene the joint session while rioters were present.

Lieutenant Scott Grossi of the United States Capitol Police ("USCP") responded to the Senate Wing Door, which had been breached at 2:13 PM. When he arrived, he saw other officers holding back rioters, and glass on the floor. There were sirens going off from inside the building, which were deafening. The USCP used a desk as a barricade, but they were unable to hold back the rioters. Instead, the officers formed a line to prevent rioters from going north towards the Senate side of the Capitol.

The Defendants traveled to Washington, D.C. from Maryland to attend former President Trump's rally taking place on the ellipse. In advance of January 6, Mrs. Price sent several messages about her plans for the day, including that she "needed to do something more than vote." Mrs. Price also brought a pocketknife and pepper spray to the District. Once the Defendants arrived at the rally, they could not hear the speech, so they left and walked down Constitution Avenue towards the Capitol. Mrs. Price knew that Senators were meeting that day to confer over the electoral vote, which would take up a lot of the day.

On their way, the Defendants stopped at a café where Mrs. Price received a text message that the Capitol had been breached. Around the same time, Mr. Price believed that he heard a bomb. Mrs. Price heard flashbangs. She also saw a multitude of police cars, officers, sirens, and fire engines. Nonetheless, the Defendants continued to the Capitol. On the Capitol Grounds, the Defendants climbed up an Olmsted wall, and passed downed snow fencing and bicycle racks. At 2:52 PM, Mr. Price sent a text to a friend, saying "we're just taking over the Capitol." Shortly after

2

that text, he sent other texts that tear gas and explosions were going off, and that someone was on the floor being administered CPR. Mrs. Price also took a video of a woman banging on a window to the Capitol.

The Defendants then made their way to the Senate Wing Door, where the deafening alarms continued to sound. When the Defendants entered the Capitol, there were police officers in riot gear to their left. Mr. Price told his friend by text that they were "in," and that broken glass was everywhere. A few minutes later, as the crowd was chanting fight for Trump, Mr. Price texted a friend "worth fighting for Trump" with a photograph of the line of police officers. The Defendants then left the Capitol, having spent approximately seven minutes inside.

After leaving the building, at 3:51 PM, Mr. Price said "we went inside. They can't stop you. It's the people's house." At 4:51 PM, Mrs. Price said in a text that "we stormed the Capitol" and that "we totally ow[n]ed it." Earlier in the day, she also said that they would have been there for the breach if they didn't stop at the café first. In Facebook comment, Mrs. Price said that she went into the Capitol "to be heard."

At trial, the Court found Mrs. Price to be a "largely incredible witness" who did not "tell[] the truth" to the Court. Trial Tr., Mar. 21, 2023, 170:2, 12. As a result, the Court appropriately "discount[ed] all of her testimony in regard to her motives and what she saw and heard upon entry" of the Capitol. *Id.* at 170:18-19. As for the government's witnesses, the Court found them all credible. *Id.* 166:6-8.

**DISCUSSION**

I.   **The Government Presented Sufficient Evidence to Prove the Defendants' Guilt of All Charges Beyond a Reasonable Doubt**

   A. **The Defendants Knowingly Entered and Remained in a Restricted Building Without Lawful Authority to do so**

In order to find the Defendants guilty of Count 1 of the Superseding Information, charging the Defendants in violation of 18 U.S.C. § 1752(a)(1), the Court must find the following elements: (1) the Defendants entered or remained in any restricted building or grounds, (2) they did so knowingly, and (3) they lack lawful authority to do so.

A restricted building or grounds is "any posted, cordoned off, or otherwise restricted area . . . of a building or grounds where the President or other person protected by the Secret Service is or will be temporarily visiting." 18 U.S.C. § 1752(c)(1)(B). The Vice President of the United States is a person protected by the Secret Service. 18 U.S.C. § 3056(a)(1). On the 6th of January following a presidential election, the United States Constitution and the Electoral Count Act dictate that the Vice President will preside over a joint session of Congress to count the votes of the Electoral College. U.S. CONST. art. I, § 3, cl. 4; 3 U.S.C. § 15 . Further, the Court found that, on January 6, 2021, Vice President Pence arrived at the Capitol shortly before 1:00 PM for this purpose. Trial Tr., Mar. 21, 2023, 167:1-3. Lastly, the fact that the Defendants entered the Capitol is not in dispute. *See* ECF No. 108-1 at 6. Thus, the government established that the Defendants entered the United States Capitol on the date of offense, and that the Capitol was a restricted building at the time of entry.

A person acts "knowingly" if they realize what they are doing and are aware of the nature of their conduct, and does not act through ignorance, mistake, or accident. See Seventh Circuit Pattern Criminal Jury Instructions; see also *Arthur Andersen LLP v. United States*, 544 U.S. 696, 705 (2005). However, a person who enters or remains in a restricted area with a good faith belief

that they are entering with the lawful authority did not do so knowingly. With respect to entering the Capitol Building, the Court found that the Defendants had knowledge of multiple indications that the Capitol was restricted, including: (1) Mrs. Price heard that the Capitol was "breached" prior to going to the Capitol Grounds; (2) Mr. Price heard an explosion going off near the Capitol, (3) Mrs. Price heard flashbangs; (4) upon arrival to the grounds, the Defendants saw discarded bicycle racks and snow fencing on the Building's perimeter; (5) Mr. Price saw someone receiving CPR inside the Capitol; (6) Mr. Price sent a text message to a friend that they were "just taking over the Capitol"; (7) deafening alarms rung as the Defendants entered the Senate Wing Door; (8) upon entry, the Defendants saw at least a dozen police officers wearing riot gear to their left, and broken glass on the floor; (9) there was tear gas in the air; and (10) after leaving the Capitol, Mrs. Price said that they "stormed the Capitol." Trial Tr., Mar. 21, 2013, 167:8-171:16. These factors provide ample evidence to conclude that the defendants knew that they should not enter the Capitol Building. Lastly, the Defendants are not members of Congress nor their staff. The Defendants were not members of law enforcement responding to the riot. As such, they had no lawful authority to enter the Capitol on January 6, 2021.

In arguing that the government did not meet its burden, the Defendants assert that there was "no evidence of signs or postings outside the door or police guarding the Senate Wing Door from outside as the Prices entered." ECF No. 108-1 at 6. This argument attacks the statutory definition of a restricted area as something that is "posted" or "cordoned off." 18 U.S.C. § 1752(c). The Defendants, however, fail to grapple with the catch-all provision that a building or area may be "otherwise restricted." *Id.* This provision allows for the existence of facts beyond signs or physical barriers to indicate that an area is restricted.

In this case, those facts included the deafening alarm coming from the Senate Wing Door, the police officers in riot gear just inside the Capitol where the Defendants entered, the sounds of

explosions and flashbangs, the presence of tear gas and broken glass, and discarded bicycle racks and snow fencing. The government also presented evidence at trial that the Defendants walked directly by a standing bicycle rack with an area closed sign when they walked onto the Capitol's Terrace. Gov't Ex. 301 at 0:10. In addition, the Defendants themselves appear to have independent knowledge that the Capitol was restricted. Mr. Price said that they were "taking over" the Capitol. Mrs. Price said that they "stormed" the Capitol. One does not use this language when speaking of a place they are allowed to enter. This language conveys a meaning of conquest and capturing property held by others. The evidence at trial showed not just that the Capitol was a restricted building, but the Defendants knew it was restricted and went inside anyway.

Moreover, the Defendants' argument ignores the other portion of the statute, which criminalizes knowingly remaining in a restricted area, once a person becomes aware of their unauthorized entry. 18 U.S.C. § 1752(a)(1). Even if the Defendants did not see the police officers in riot gear or hear the deafening alarm until after they entered the building, both questionable assertions, they nonetheless became aware of those facts immediately upon entry. Despite this "new" knowledge, the Defendants still continued onward.

**B. The Defendants Knowingly Engaged in Disruptive Conduct in a Restricted Building with the Intent to Impede or Disrupt the Orderly Conduct of Government Business or Official Functions.**

In order to find the Defendants guilty of Count 2 of the Superseding Information, charging the Defendants in violation of 18 U.S.C. 1752(a)(2), the Court must find the following elements: (1) they engaged in disorderly or disruptive conduct; (2) in a restricted building or grounds; (3) with the intent to impede or disrupt the orderly conduct of Government business or official functions; and (4) that such conduct, in fact, impedes or disrupt such business or functions. As it has already been established that the United States Capitol was a restricted building on January 6, 2021, *supra* Section I.A, the government turns to the remaining three elements.

When the Defendants entered the Capitol, they entered the Senate Wing Door, walked south towards the Crypt, turned back around after a few minutes, and then eventually left back out the way they entered. Gov't Ex. 202D at 2:38-9:03. While inside, the Defendants took several pictures of the interior of the Capitol as well as themselves. *See* Gov't Exs. 104, 107M-Q. As the Court noted in its findings the Defendants' conduct might not be disruptive if viewed in a vacuum. Trial Tr., Mar. 21, 2023, 171:23-24. The Defendants' actions, however, did not occur in a vacuum. Rather, the Defendants entered the United States Capitol during a violent riot and when Congress was scheduled to certify the presidential election with the Vice President present. Thus, their actions must be viewed in that frame.

At trial, Captain Jessica Baboulis testified that the presence of unauthorized persons inside the restricted perimeter meant that the US Capitol Police "could not allow the Congress to continue with their business." Trial Tr., Mar. 20, 2023, 47:9-10. Further, Congress could not reconvene until all rioters exited the restricted perimeter, "[b]ecause any individual could present a threat." *Id.* 48:8. This response by the USCP to rioters inside the Capitol meant that the Defendants' actions on January 6 were no longer "peaceful" as the Defendants argue. *See e.g.*, ECF No. 108-1 at 7. Instead, their actions meant that the USCP could not allow Congress to continue certifying the results of the presidential election, because any unauthorized person in the restricted perimeter could present a threat. This reaction by the USCP is by no means unwarranted. Hundreds of law enforcement officers were attacked by rioters on January 6 and several people died because of what happened on that day. Even Mrs. Price was a threat, even though she did not assault anyone or damage any property, because she brought a knife and pepper spray into the Capitol. Trial Tr., Mar. 21, 2023, 73:16, 74:7. Items that never would have made it into the building had Mrs. Price gone through the normal security screening process. Trial Tr., Mar. 20, 2023, 34:1-3, 50:19-23.

Thus, the Defendants' mere presence in the Capitol impeded Congress's ability to perform its official functions.

Yet, the Defendants were not alone on January 6. Rather, they were part of a riot consisting of thousands of people determined, at best, to make their voices heard about the 2020 presidential election. Every additional person present at the Capitol was one more threat that law enforcement had to address. As Lieutenant Scott Grossi testified about the Senate Wing Door breaches, "[t]he people outside were pushing through using . . . the sheer numbers they had to overtake us." Trial Tr., Mar. 20, 2023, 76:1-2. Lt. Grossi also testified that despite being at the Senate Wing Door for a few hours, he and his officers could not hold back the rioters because they "were just outnumbered." *Id.* at 77:9. This point is not to say that the Defendants pushed or assaulted officers. Instead, by just being another person present inside the Capitol, the Defendants further outnumbered police officers and prevented them from taking the steps necessary to reconvene Congress.

The Defendants argue that they were not disruptive for two reasons. First, they assert that their conduct was peaceful and thus they could not have been disruptive. ECF No. 108-1 at 7. To make this point, they assert that their conduct "is not criminal in a museum," using a museum to set the floor of how to gauge whether conduct is disruptive. *Id.* The Defendants, however, continue to add a qualification to their conclusion with the exact situation that this case presents. They note that their conduct would not be disruptive in "virtually . . . all public settings." *Id.* The Defendants rightly point out that conduct can still be disruptive in some public settings, even if it is not disruptive in virtually all others. Quietly walking down the aisle in the middle of a wedding ceremony, for example, is just such a situation.[3] In this case, the Defendants walked into a heavily

---

[3] The Defendants counter this analogy by equating their conduct to someone having a heart attack at a wedding. ECF No. 108-1 at 21. Their analogy is inapplicable because for an action to be an

restricted building filled with over five hundred members of the legislative branch of government as well as the Vice President of the United States without going through security screenings while possessing a knife and pepper spray. While this conduct may not be disruptive in all contexts, in the context of January 6, it certainly was.

The Defendants also protest their association with the mob at the Capitol. They assert that the Court "create[d] law" by concluding that the Defendants were in a mob that day. *Id.* at 6. The Court made no such action. Rather, the Court only mentioned the word "mob" on two occasions in its findings, both within the same sentence. Trial Tr., Mar. 21, 2023, 171:24-25, 172:1-3. The importance of the mob on January 6 was that the mass of people present at the Capitol outnumbered law enforcement and enabled the hours-long delay of the Electoral College certification. As already stated above, each additional person was one more threat that law enforcement needed to address. The term does not impute the conduct of others to the Defendants. Instead, the existence of the mob, and the Defendants' presence therein, only serves to demonstrate that the Defendants did not act in a vacuum. This context thereby informs why the Defendants' conduct was capable of disrupting, and in fact disrupted, the orderly business of Congress.

The Defendants also briefly challenge whether they intended to impede the orderly functions of Congress. ECF No. 108-1 at 38-39. Without any factual analysis of the case, the Defendants assert that because the Court's *actus reus* analysis is flawed, the Court's *mens rea* analysis is necessarily erroneous as well. *Id.* at 39. However, by looking at the Defendants'

---

*actus reus*, the act must be voluntary. *Actus reus*, BLACK'S LAW DICTIONARY (11th ed. 2019). Someone experiencing a life-threatening medical emergency, such as a heart attack, cannot be said to have acted voluntarily. However, even if the Defendants argued that they were like the clichéd persons who objected during a wedding ceremony, that comparison is still unsuited here. The Defendants' elected representatives, not the Defendants themselves, were the ones empowered to object to the Electoral College certification. *See* 3 U.S.C. § 15 ("Every objection . . . shall be signed by at least one Senator and one Member of the House of Representatives . . . .").

statements made before, during, and after their entry into the Capitol, it is clear what the Defendants wanted to do on January 6. In the lead up to the riot, Mrs. Price said that she wanted to do something more than vote. Trial Tr., Mar. 21, 2023, 167:24. During the riot, Mr. Price said that they were "just taking over the Capitol." *Id.* at 168:23-24. Once inside, Mr. Price said that it was "worth fighting for Trump" to be in the Capitol and confront police officers. *Id.* at 169:11-12. After leaving, Mrs. Price said that she "stormed" the Capitol because she wanted to go inside "to be heard." *Id.* at 169:16, 170:16. These statements prove that the Defendants went into the Capitol because they wanted Congress to hear what they had to say, and that they did so by "taking over" and "storming" the building. Yet even without such obvious statements of intent, the Court may reasonably infer from the evidence the Defendants' intent, based on the natural and probable consequences of their respective actions.

### C.  The Defendants Knowingly Engaged in Disruptive Conduct in a Capitol Building with the Intent to Impede or Disrupt the Orderly Conduct of a Session of Congress.

In order to find the Defendants guilty of Count 3 of the Superseding Information, charging the Defendants in violation of 40 U.S.C. § 5104(e)(2)(D), the Court must find the following elements: (1) they engaged in disorderly or disruptive conduct; (2) at any place in the Grounds or in any of the Capitol Buildings; and (3) with the intent to impede or disrupt the orderly conduct of a session of Congress or either House of Congress, or the orderly conduct in that building of a hearing before, or any deliberations of, a committee of Congress or either House of Congress.

This charge mimics the structure of 18 U.S.C. § 1752(a)(2). As the government already laid out the reasons why the evidence at trial supported the Defendants' guilty finding for that charge, it will only briefly restate those reasons here. As for the first and second elements, the Defendants entered the United States Capitol during a joint session of Congress. Their actions, in part, delayed the legislative body's ability to continue with its business. As for the third element,

the Defendants' statements provide ample evidence to conclude that they wanted to impede Congress.

**D. The Defendants Paraded, Demonstrated, or Picketed in any of the Capitol Buildings.**

Count 4 of the Superseding Information only contains two elements. First, that the Defendants paraded, demonstrated, or picketed. Second, that they did so in any of the Capitol Buildings. In this case, the second element is already established by the Defendants entering the Capitol Building. Thus, the only remaining question is whether they paraded, demonstrated, or picketed while inside.

Throughout their motions, the Defendants argue that they did nothing in the Capitol, except walk in and walk out. This conduct, they claim, cannot be demonstrative, because it was not organized and did not involve some kind of outward conveyance of the Defendants' political views. ECF No. 108-1 at 27. This argument from the Defendants, however, demands a higher standard than what is actually required under the statute.  *See United States v. Rivera*, 607 F.Supp.3d 1, 10 n.16 (D.D.C. 2022) (concluding that "mere presence in a protest, along with other words or conduct that ratify interest in demonstrating, is 'demonstrating' for the purposes of a criminal statute that bars the actus reus of 'demonstrating.'"); *see also Brown v. Louisiana*, 383 U.S. 131, 142 (1966) (protest and demonstration includes the right to "protest by silent and reproachful presence"). A demonstration is not something that is cabined to the loud or destructive. This country has seen countless events that are demonstrations simply because people showed up at a place that was the focal point of their beliefs. People, like the Defendants, showed up at the rally on the Ellipse to show their support for the former President. The Defendants, along with thousands of others, then continued onto "storm[]" the Capitol so that they could go inside and "be

heard." Trial Tr., Mar. 21, 2023, 169:16, 170:16. Thus, regardless of how quiet or peaceful the Defendants were when they entered the Capitol, the government met its burden as to Count 4.

Even if the Defendants' view of the law was correct, the Government still met its burden. First, the Defendants walked with a large group of people from the Ellipse to the Capitol Building who were "gathered together in support of the country." Trial Tr., Mar. 21, 2023, 36:2. In other words, the Defendants marched in concert to the Capitol with people who shared their political beliefs. This march, or parade, continued as the Defendants went into the Capitol. The Defendants also made their opinions known. From the Ellipse to the Capitol, Mrs. Price held a "All Aboard the Trump Train" Flag. Gov't Exs. 304, 305. Mr. Price also wore a hat that said "Trump" on the back and "45" on the side. Gov't Exs. 300 at 0:06, 305. Certainly, these items fit the Defendants' definition of demonstrative conduct that includes "the display of any placard, banner, flag, or similar device." ECF No. 108-1 at 27. The government does not assert that displaying these items actually meets the burden placed by the statute. The government simply states that its burden is met under the Defendants' proposed legal standard.

## II.    __The Defendants Failed to Met Their Burden to Demonstrate the Need for New Trial__

In their second post-trial motion, the Defendants assert five claims that request a new trial under Rule 33 of the Federal Rules of Criminal Procedure. ECF No. 109-2 at 1-3. Those claims include: (1) the Court used the incorrect standard of law by incorporating "mob" into its analysis for Counts 2-4; (2) the government improperly used Mrs. Price's complete Facebook records during cross-examination, which were admitted during the government's case-in-chief without objection; (3) the government withheld *Brady* material by providing the defense with Mrs. Price's complete Facebook return; (4) the Court made false findings of fact; and (5) the Court factual findings were incomplete with respect to Mrs. Price's use of emojis. The government already

addressed the Defendants' arguments regarding the use of mob, so it will not restate the argument here. *Supra* Section I.B. Thus, the government turns to the Defendants' four remaining claims.

In a motion for new trial, the defendant bears the burden to show that a new trial is justified by showing that a miscarriage of justice may have resulted. *United States v. Young*, 12-CR-00042 (BAH), 2013 WL 12430550, *4 (D.D.C. July 22, 2013). Failure to object to an action by the government is reviewed under plain error. *United States v. Young*, 470 U.S. 1, 14-15 (1985). Plain error is used "used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result." *Id.* at 15 (citing *United States v. Frady*, 456 U.S. 152, 163 n.14 (1982)). To find such a miscarriage, "[t]he evidence must preponderate heavily against the verdict." *United States v. Green*, 19-CR-00019 (RDM), 2022 WL 16961127, at *9 (D.D.C. Nov. 15, 2022).

## A. The Defendants Failed to Show a Miscarriage of Justice with Respect to Their Facebook Records

The Defendants argue that the government improperly Mrs. Price's Facebook records at trial, specifically a post by Mrs. Price concerning the execution of Vice President Pence. They argue that the Facebook records contained *Brady* material buried inside, which the Defendants did not have the opportunity to review prior to trial. ECF No. 109-2 at 8-11. This claim is without merit. The government provided the defense with the Defendants' complete Facebook returns on January 5, 2023, months in advance of the trial. The government then included the returns on its exhibit list, which was provided to defense counsel on March 15, 2023. At trial, the government moved to admit the complete returns into evidence as Gov't Exs. 308A, 308B, and 309A. The Defendants did not object to their admission and the Court admitted them. Trial Tr., Mar. 20, 2023, 115:16-116:4.[4] As such, the Defendants had ample time to raise their concern about the

---

[4] The government acknowledges that Ex. 308B is missing from the parenthetical within the trial transcript of admitted exhibits. However, this omission is likely an error as the government moved for the admission of Ex. 308B at the same time as the other Facebook materials, Trial Tr.,

admissibility of the return prior to and during trial, but nonetheless failed to do so. Thus, the Court must review the Defendants' claim for plain error.

In this case, no such error occurred. Other than admitting the complete Facebook returns, the government never cited to the exhibits during its case-in-chief. On cross-examination, which spans over 50 pages of the trial transcript, the government posed seven questions about the execution post. This brief set of questions was a small portion of the cross examination that challenged Mrs. Price's credibility. Indeed, the Court cited seven different reasons to question Mrs. Price's credibility, only two of which related to that exchange. Lastly, the evidence presented by the Government against the Defendants during its case-in-chief was overwhelming. Between videos, text messages, and portions of their Facebook accounts, the government identified well over one hundred statements by the Defendants. These statements showed the Defendants' intent to take over and storm the Capitol to voice their grievances about the presidential election. The Court also received a dozen videos as evidence, which charted the Defendants' path in and out of the Capitol Building and its Grounds. For these reasons, the Defendants have not established the existence of a miscarriage of justice.

### B.  The Court Made No Factual Errors in its Findings

The Defendants next suggest that the Court made incorrect findings of fact. First, the Defendants state that there was no tear gas outside of the Capitol around the time that they went inside. ECF No. 109-2 at 11. This conclusion, however, is belied by Mr. Price's own text message where he said "[t]ear gas and explosions going off." Gov't Ex. 107I. This message was sent in sequence prior to the messages sent while the Defendants were in the Capitol. *See* Gov't Ex. 107M; Testimony of Special Agent Belcher, Trial Tr., Mar. 20, 2023, 135:23-136:1. The Defendants thus

---

Mar. 20, 2023, 115:22-25, the Court indicated that the exhibit was admitted, *Id.* at 116:1-2, and it is listed as an admitted exhibit. ECF No. 104 at 8.

had knowledge of tear gas being used prior to their entry, which informs of their state of mind. Whether there is direct evidence of the tear gas is immaterial.

The Defendants' final argument is that Court reviewed incomplete statements with respect to Mrs. Price's use of emojis. The defense first raised this issue on the first day of trial, arguing that the statements contained within Ex. 110 lacked the proper emojis. Trial Tr., Mar. 20, 2023, 124:1-8. The following day, the government clarified that the Federal Bureau of Investigation's extraction software did not transfer the original emojis over from Mrs. Price's phone. Trial Tr., Mar. 21, 2023, 4:2-12. This issue contrasts with Mrs. Price's Facebook records where the government provided the Court with the correct emojis in supplement exhibits. *See* Gov't Exs. 306A, 307A. Yet, the question remains of whether a miscarriage of justice occurred. The text messages in question are three of nearly written hundred statements made by Mrs. Price that the government admitted in this trial. Some of those statements included the "joking" emojis. The Court nonetheless found Mrs. Price to be incredible, a finding unlikely to have changed with a few additional emojis.

<u>**CONCLUSION**</u>

For these reasons, the United States requests that the Court deny the Defendants renewed motion for judgment of acquittal and motion for new trial.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY
D.C. Bar Number 481052

/s/ Andrew Haag
ANDREW S. HAAG
Assistant United States Attorney
MA Bar No. 705425
601 D Street, N.W.
Washington, DC 20530
(202) 252-7755
Andrew.Haag@usdoj.gov

/s/ Ashley Akers
ASHLEY AKERS
Trial Attorney
MO Bar No. 69601
Detailed to the U.S. Attorney's Office
601 D Street NW
Washington, DC 20530
(202) 353-0521
Dated May 9, 2023                       Ashley.Akers@usdoj.gov

16