**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 21-cr-719** |
| **v.** | : | |
| | : | |
| **CHRISTOPHER PRICE,** | : | |
| | : | |
| **Defendant** | : | |

<u>**GOVERNMENT'S SENTENCING MEMORANDUM**</u>

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Defendant Christopher Price to six months' incarceration, at the low end of the guideline range calculated by the government, twelve months of supervised release, a fine, and $500 in restitution.

## I.      Introduction

Defendant Christopher Price, a 57-year-old owner of a print shop, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was approximately $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

Following a two-day bench trial, this Court found Price guilty of Entering and Remaining in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(1); Disorderly and Disruptive Conduct in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(2); Entry and Disorderly Conduct in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(D); and Parading, Demonstrating, or Picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G).

As explained herein, a sentence of six months of incarceration is appropriate in this case because Price (1) approached the Capitol building after walking past "Area Closed" signs and bike rack barriers, (2) continued forward after seeing rioters bang on a window of the Capitol, hearing statements like, "Are we going to kidnap Pence? That would be cool," and witnessing a person receiving CPR on the floor inside the Capitol building, (3) entered the Capitol while ignoring signs that indicated he should not, such as alarms blaring, broken glass scattering the floor, lines of police officers in rioter gear, and people climbing through windows, (4) watched as rioters breached the Capitol at the North Door, (5) texted his friend to brag about his participation in the riot, noting when he was "In" the building and stating that it was "worth fighting for Trump," and (6) has not expressed any remorse for or accepted responsibility for his actions.

The Court must also consider that Price's conduct on January 6, like the conduct of hundreds of other rioters, took place in the context of a large and violent riot that relied on numbers to overwhelm police officers who were trying to prevent a breach of the Capitol Building, and disrupt the proceedings. Without the aggregated efforts of rioters like Price, the riot would likely have failed. Here, the facts and circumstances of Price's crimes support a Guidelines sentence of six months' incarceration, twelve months of supervised release, a fine, and $500 in restitution.

## II.    Factual and Procedural Background

*The Charges and Trial*

On July 30, 2021, the United States charged Price by criminal complaint. On August 9, 2021, law enforcement officers arrested Price in Baltimore, Maryland. On December 8, 2021, the United States charged Price and Ballenger in a Four Count Information with violating 18 U.S.C. §§ 1752(a)(1) and (2), and 40 U.S.C. §§ 5104(e)(2)(D) and (G). On March 20, 2023, a bench trial was held against both defendants on all charges. On March 21, 2023, the Court convicted both defendants on all counts.

*The January 6, 2021 Attack on the Capitol*

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF No. 1-1 (Affidavit in Support of Criminal Complaint), at 1-2.

*Defendant Price's Role in the January 6, 2021 Attack on the Capitol*

As the Court found, Price was a knowing participant in the mob. Price's wife, Cynthia Ballenger, convinced him to travel to Washington, D.C. on January 6. Trial Tr. Mar. 21, 2023 at 72. Ballenger was excited about traveling to Washington, D.C. on January 6 because she believed the election results were fraudulent and she wanted to make a difference to change them.

On January 6, 2021, Christopher Price and Cynthia Ballenger traveled to Washington, D.C. from their home in Maryland to attend the "Stop the Steal" rally. They were prepared for possible violence. Ballenger armed herself with pepper spray and a knife, Trial Tr. Mar. 21, 2023 at 74-167, and considered bringing bear spray at the request of Price – but it wouldn't fit in her purse, Trial Tr. Mar. 21, 2023 at 75-76; Ex. 307 at 9-10. [2]

---

[2] To avoid confusion, the government has retained the exhibit numbering of its trial exhibits in this sentencing memorandum. Citations to "Ex. __" refer to these trial exhibits. These exhibits

Once in the District, Price and Ballenger attended the "Stop the Steal" rally at the ellipse. Afterward, Price and Ballenger walked to a local café where Price told Ballenger that he heard what sounded like a bomb. Ballenger's friend then texted and reported that the Capitol had been breached. After hearing that the Capitol building had been "breached," Price and Ballenger marched to the Capitol grounds – and, along the way, saw a multitude of police cars with sirens, police officers, and fire engines with lights flashing. Trial Tr. Mar. 21, 2023 at 91-92, 168. When Price and Ballenger reached the outer edge of the restricted perimeter, they climbed over an Olmsted wall, which is a permanent security structure, Trial Tr. Mar. 20, 2023 at 36, and marched towards the Capitol, Ex. 202B at 4:35-4:40. After climbing over the wall, Price pumped his fist in the air. *Id.* at 4:40-4:45. Price and Ballenger walked past downed snow fencing and bike racks. Trial Tr. Mar. 21, 2023 at 168.

When Ballenger recorded a video as she and Price reached the Upper West Terrace, which showed the pair walking past a bike rack with an "AREA CLOSED" sign on it. Ex. 301 at 0:00-0:10. Sirens blared in the background. *Id.* at 0:10-0:39. A police officer walked by and a rioter yelled, "Traitor, you are fucking traitors!" *Id.* at 0:39-1:10. As they continued walking toward the Upper Northwest Terrace, Price said, "This is crazy. Look at this shit. They're going to be pissed at Trump for this." Ex. 300 at 1:05-1:23.

As rioters chanted "WHOSE HOUSE, OUR HOUSE!" Price took a photo of the Capitol grounds facing West. Ex. 300 at 0:00-0:23. He later sent this photo in a text message with the caption, "We're just taking over the Capitol." Ex. 107I.  As they continued walking toward the

---

are included with this sentencing memorandum. Citations to "Trial Tr." refer to the transcript from the trial.

Upper Northwest Terrace, Price can be heard in Ballenger's video saying, "This is crazy. Look at this shit. They're going to be pissed at Trump for this." Ex. 300 at 1:05-1:23.

Before entering the Capitol building, Price walked to a window and Ballenger followed recording with her cell phone. Someone next to Price and Ballenger said, "Are we going to kidnap Pence? That would be cool." Price approached the window, smiled, and watched as another rioter pounded on the window. Ex. 208. Price then peered into the window.



***Figures 1 & 2: Screenshot of open source video footage showing Price at a window to the Capitol building, left (Ex. 105), and a woman banging on the window, right (Ex. 106).***

Price sent a text message to his friend about what he saw when he looked inside the window. He said, "I looked through the window of the Capitol somebody's on the floor being administered CPR didn't look good." Ex. 107 at 10. As the Court found, this showed "knowledge that what was happening was hardly a peaceful situation." Trial Tr. Mar. 21, 2023 at 169.

Price then sent a text message to the same friend, saying, "tear gas and explosions going off." Price and Ballenger marched closer to the Senate Wing Door and, before they made it there, they posed for a photo.



*Figure 3: Photo of Cynthia Ballenger and Christopher Price posing in front of the Capitol building prior to entering the building (Ex. 305)*

Price and Ballenger entered the Capitol building through the Senate Wing Door at about 3:07 p.m. Ex. 202C at 1:00-1:09. As they entered, alarms blared, *see* Ex. 203 at 0:01; Ex. 205 at 8:43; Ex. 702 at 1:40-2:00, tear gas filled the air, and police officers stood guard, Trial Tr. Mar. 21, 2023 at 169.



*Figure 4: Screenshot of Capitol surveillance footage showing Christopher Price and Cynthia Ballenger entering the Capitol building (Ex. 109)*

Price and Ballenger walked down the hallway toward the Crypt, past the shattered glass on the floor from the smashed-in window. Once inside, Price sent a text message to a friend that said, "In" and a photo of a police officer standing inside the Capitol building. Ex. 107 at 13.

Price and Ballenger eventually turned around and walked back toward the Senate Wing Door area, taking photos along the way.

 

***Figures 5 & 6: Photo showing of inside the Capitol building, left (Ex. 103), and selfie photo showing Ballenger and Price, right (Ex. 104)***

Once back in the Senate Wing Door foyer, Price turned towards a line of police officers and took photos. Ex. 207 at 0:45. Price sent another photo to his friend, this time of a police officer standing inside the Capitol building with the caption, "Broken glass everywhere." Ex. 107 at 14. He then sent a photo of the mob of rioters inside the Senate Wing Door foyer and a photo of people climbing through windows, with the caption, "Climbing through the window." Ex. 107 at 15; Ex. 206 at 0:45.

Price's friend responded, "Be peaceful & safe." Ex. 107 at 15. Price replied with a photo of a line of police officers captioned, "Worth fighting for Trump." Ex. 107 at 16; Ex. 206 at 1:48-1:53; Ex. 206 at 1:53-2:28 (rioters chanting "Fight for Trump" as Ballenger and Price exit). Price's friend responded, "Yes, just be peaceful." Ex. 107 at 17.  Price replied with a photo of rioters

attempting to enter the Capitol building through the North door and a photo of police officers holding a line and trying to disperse rioters. *Id.* at 18.

After exiting the Capitol building, Price and Ballenger remained on Capitol grounds to watch the chaos continue to unfold. Ballenger took photos and video of rioters trying to gain access into the Capitol building through the North Door.



***Figure 7: Photo showing rioters attempting to breach the North door***
***taken by Ballenger (Ex. 110 at 17)***

Price and Ballenger stayed on restricted grounds and watched as a mob of rioters attempted to break through the North Door. *See* Ex. 202E.



***Figure 8: Screenshot of Capitol surveillance footage showing Price and Ballenger (yellow circle) watching rioters attempt to breach the Capitol (Ex. 202E at 6:20)***

In Ballenger's video recording, a male voice can be hearing talking about "steal[ing] an election," Ex. 302 0:39-0:42, just as rioters breaking into the building start to loudly cheer. As the rioters continue to cheer loudly, someone in Ballenger's video says, "did they get in? I think they got in! They got in. . . . Ah shit they must have got in. . . .  I heard either – that was wood breaking." *Id.* at 0:42-1:10. The crowd started chanting "USA! USA!" and a male voice near Ballenger said, "they prolly left in an underground tunnel or something." *Id.* at 1:50-2:07. Ballenger continued recording for several minutes. In the recording, rioters nearby Ballenger said things like, "We went inside, they can't stop you. It's the people's house," *Id.* at 2:45-3:04, and "there's a lot more people. They destroyed everything. Hung it over the stairs. They were shooting off mace and everything. It wasn't antifa, it was the capitol police. They took over like – they just. . . . . climbed the walls. There's guys climbing up the wall on the other side," *Id.* at 3:04-3:10.

As tear gas emanated from the building, a rioter, likely Price, can be heard on Ballenger's video saying, "there's the tear gas, is that the tear gas? Here comes the tear gas! I wanna get tear gassed. Wanna get a little breath of that to say we got tear gassed. . . . Here comes all the runny eyes. That stuff will mess you up." *Id.* at 3:35-4:12; Trial Tr. Mar. 20, 2023 at 164. Shortly after, a rioter, again likely Price, says, "oh no we'll be the most violent protestors ever." Another rioter responds, "When you steal an election, what do you expect? The people voted. The people voted." *Id.* at 4:12-4:50.

### III.    Statutory Penalties

Price now faces a sentencing on all four counts. As noted by the U.S. Probation Office, Price faces up to one year of imprisonment his violations of 18 U.S.C. §§ 1752(a)(1) and (a)(2)

and six months imprisonment for his violations of 40 U.S.C. §§ 5104(e)(2)(D) and (e)(2)(G). He also faces a fine of up to $100,000.

## IV.     The Sentencing Guidelines and Analysis

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49. The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing. *Id.* at 49.

The government concurs with Probation that the Sentencing Guidelines offense level is 10, but disagrees with Probation on the process to calculate that offense level. The Guidelines set out the specific "order" of the analysis: first, determine the offense guideline; second, determine the base offense level and apply appropriate specific offense characteristics, cross references, and special instructions; third, apply any adjustments in Parts A, B, and C of Chapter 3. U.S.S.G. §1B1.1(a)(1)-(3). Then, repeat each step for each count. U.S.S.G. §1B1.1(a)(4). Finally, perform the grouping analysis in Part D of Chapter 3. *Id.*

In the pre-sentence report, the Probation Office did not employ this specified procedure to determine the total combined offense level. Rather, the Probation Office started with the grouping analysis in Part D of Chapter 3, PSR ¶ 37, then performed the Guidelines analysis, but only for Count Two, PSR ¶¶ 39-47. The Probation Office calculated the offense level for Count Two as follows:

<u>Count Two: 18 U.S.C. § 1752(a)(2)</u>

| | | |
|---|---|---|
| Base Offense Level | U.S.S.G. §2A2.4(a) | +10 |
| Acceptance of Responsibility | U.S.S.G. §3E1.1(a) | 0 |
| **Total Offense Level** | | **+10** |

The U.S. Probation Office calculated Price's criminal history as a Category I. PSR at ¶ 53.

Accordingly, the Probation Office calculated Price's corresponding Guidelines imprisonment

range at 6 to 12 months. PSR at ¶ 92.

The appropriate offense level computations for Count One and Count Two, prior to any

grouping analysis under Part D of Chapter 3, are as follows:

<u>Count One: 18 U.S.C. § 1752(a)(1)</u>

| | | |
|---|---|---|
| Base Offense Level | U.S.S.G. §2B2.3(a) | +4 |
| Specific Offense Characteristics | U.S.S.G. §2B2.3(b)(1)(A) | +2 |
| Acceptance of Responsibility | U.S.S.G. §3E1.1(a) | 0 |
| **Total Offense Level** | | **+6** |

<u>Count Two: 18 U.S.C. § 1752(a)(2)</u>

| | | |
|---|---|---|
| Base Offense Level | U.S.S.G. §2A2.4(a) | +10 |
| Acceptance of Responsibility | U.S.S.G. §3E1.1(a) | 0 |
| **Total Offense Level** | | **+10** |

*See* PSR at ¶¶ 33-47.

The government agrees with the Probation Office that Counts One and Two group because

all involve the same victim: Congress. U.S.S.G. §3D1.2(d). The offense level for that Group is the

level "for the most serious of the counts compromising the Group, *i.e.*, the highest offense level of

the counts in the Group." U.S.S.G. §3D1.3(a). Since Count Two has the highest offense level for

any count in the group, the offense level for the group is **10**. Accordingly, the government agrees

with the Probation Office that Price's Guideline imprisonment range calculation is 6 to 12 months.

For the reasons that follow, the government asks this Court to impose a sentence of six months'

incarceration, at the low end of that range.

11

Here, while the Court must consider the Section 3553 factors to fashion a just and appropriate sentence, the Guidelines unquestionably provide the most helpful benchmark. As this Court knows, the government has charged a considerable number of persons with crimes based on the January 6 riot. This includes hundreds of felonies and misdemeanors that will be subjected to Guidelines analysis. In order to reflect Congress's will—the same Congress that served as a backdrop to this criminal incursion—the Guidelines are a powerful driver of consistency and fairness.

## V.   Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. In this case, as described below, the Section 3553(a) factors weigh in favor of a sentence of incarceration of ten months.

### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6 posed "a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). The attack "endangered hundreds of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States v. Judd*, 21-cr-40, 2021 WL 6134590, at *5 (D.D.C. Dec. 28, 2021). While assessing Ballenger's participation in that attack to fashion a just sentence, this Court should consider various aggravating and mitigating factors. Notably, for a misdemeanor defendant like Ballenger, the absence of violent or destructive acts is not a mitigating factor. Had Price engaged in such conduct, he would have faced additional criminal charges.

The nature and circumstances of Price's offenses warrant the requested sentence. Price entered the Capitol building after seeing every sign that he should not – he looked inside a window

in the building and allegedly saw someone receiving CPR on the ground; he stood next to a man talking about "kidnapping Pence"; he walked past bike racks, area closed signs, and snow fencing; and he heard "tear gas and explosions going off." While on Capitol grounds and inside the Capitol building, he updated his friend to confirm that he made it "In" the building, he took pictures of officers standing guard (yet walked right past them), he took a picture of "broken glass everywhere," and he took a picture of rioters climbing through windows. After exiting the building, he watched as rioters continued to breach the Capitol building. He talked about people getting tear gassed and said as he watched, "they prolly left in an underground tunnel or something." And after his participation in the riot, he has continually failed to accept responsibility for his actions. Accordingly, the nature and the circumstances of this offense establish the clear need for a sentence of incarceration in this matter.

### B.  The History and Characteristics of Price

As set forth in the PSR, Price has a criminal history, including convictions of unlawful possession, destruction of property, theft, multiple counts of possession, driving under the influence, and traffic infractions. PSR ¶¶ 49-57. He has also been charged with theft, possession of unlawful substance, resisting arrest, and battery. *Id.* Price has denied the use of any illicit substances and testified negative for any illicit substances. PSR ¶ 73.

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the

presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan).

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence:* The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37).

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President.

The gravity of these offenses demands deterrence. *See United States v. Mariposa Castro*, 1:21-cr-00299 (RBW), Tr. 2/23/2022 at 41-42 ("But the concern I have is what message did you send to others? Because unfortunately there are a lot of people out here who have the same mindset that existed on January 6th that caused those events to occur. And if people start to get the impression that you can do what happened on January 6th, you can associate yourself with that behavior and that there's no real consequence, then people will say why not do it again."). This was not a protest. And it is important to convey to future potential rioters—especially those who

intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

*Specific Deterrence:* There is a need for specific deterrence in this case. To date, Price has not expressed any remorse or regret for his actions, nor has he acknowledged that his conduct on January 6 – joining a mob that stormed the Capitol building – was wrong. Price narrated his movement into the Capitol via text and remained undeterred despite all the signs indicating he should not have continued onward. As he left the Capitol building, he texted "Worth fighting for Trump" – a clear indication of his purpose for being at the Capitol on January 6. He made light of the lawmakers and staff who were barricaded inside the building when he joked, "they prolly left in an underground tunnel or something," and he joked about getting tear gassed. Specific deterrence is necessary here because Price must learn that joining a mob and storming the U.S. Capitol is not appropriate recourse to protest his concerns about supposed voting irregularities and the outcome of a presidential election.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on police officers, to conspiracy to corruptly interfere with Congress.[3] This Court must sentence Price based on his own conduct and relevant characteristics, but should give substantial weight to the context of his unlawful conduct: his participation in the January 6 riot.

---

[3] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

Price was found guilty of four Counts: 18 U.S.C. §§ 1752(a)(1), (a)(2) and 40 U.S.C. §§ 5104(e)(2)(D), (e)(2)(G). These offenses are Class A and B misdemeanors, respectively. 18 U.S.C. § 3559. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C.A. § 3553(a)(6), do apply, however.

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider . . . the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007). In short, "the Sentencing Guidelines are themselves an anti-disparity formula." *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017). Consequently, a sentence within the Guidelines range will ordinarily not result in an unwarranted disparity.

Moreover, Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the

offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id.* ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6)."). If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

In *United States v. Nassif*, 21-cr-421 (JDB), Nassif was convicted of the same four misdemeanor charges of which Price stands convicted. The evidence showed that Nassif repeatedly walked past obvious signs that the Capitol building and grounds were restricted and he entered the building through the Rotunda doors with glass visibly broken. Nassif chanted "Whose House? Our House!" outside the doors and told rioters to "keep fighting!" Nassif saw officers guarding the building but entered anyway. After January 6, Nassif spread disinformation about the

riot and his participation via social media. Nassif did not express remorse for his conduct. The court sentenced Nassif to seven months imprisonment.

Like Nassif, Price walked past numerous signs that the Capitol building and grounds were restricted and entered the building anyway. Nassif and Price ignored the broken glass, alarms sounding, chemical irritant in the air, and officers standing guard, and they entered the building anyway. Price said things like, "Look at this shit. They're going to be pissed at Trump for this" and acknowledged there was "tear gas and explosions going off" prior to entering the building. Like Nassif, Price has not expressed remorse for his conduct. Unlike Nassif, Price did not spread disinformation about the riot on social media, and thus a slightly shorter sentence is warranted.

Next, in *United States v. Rivera*, 21-cr-60 (CKK), following a bench trial, the defendant was convicted of the same four misdemeanor charges of which Price stands convicted. The evidence showed that, on January 6, Rivera ignored numerous signs indicating he should not have been on Capitol grounds. Rivera recorded rioters making their way through the police line on the Lower West Terrace and announced to his social media followed that officers were firing pepper spray at the rioters. Rivera saw rioters climbing a wall and shouted at them, "there's an easier way to get up!" Rivera also watched as rioters breached the Parliamentarian's door. Rivera entered the building through a window next to the Senate Wing Door. After January 6, Rivera did not express remorse or contrition for his actions; instead, he celebrated his participation on social media. The court sentenced Rivera to eight months in prison.

Like Rivera, Price took numerous videos and photos of the chaos at the Capitol on January 6. Price also similarly watched as rioters breached a door at the Capitol, and commented on the destruction, conversed with other rioters about a stolen election, and said things like, the lawmakers "prolly left in an underground tunnel." Although Price did not yell at other rioters to

encourage them, he sent many photos and text messages during his time on Capitol grounds, including bragging about getting "In" the building and "fighting for Trump." And before entering the building, Price looked inside a window and allegedly saw someone getting CPR and heard another rioter say, "Are we going to kidnap Pence? That would be cool." Also like Rivera, Price noticed that chemical irritant was being used to keep rioters out of the area. Price similarly has not expressed remorse for his conduct, nor has he accepted responsibility for his conduct. Finally, because Price did not celebrate his participation on social media like Rivera, a comparable, but shorter sentence, is warranted.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

## VI.    Restitution

Under 18 U.S.C. § 3556, a sentencing court must determine whether and how to impose restitution in a federal criminal case. Because a federal court possesses no "inherent authority to order restitution," *United States v. Fair*, 699 F.3d 508, 512 (D.C. Cir. 2012), it can impose

restitution only when authorized by statute, *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011). Two general restitution statutes apply here. First, the Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *Papagno*, 639 F.3d at 1096. Second, the Mandatory Victims Restitution Act ("MVRA"), Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA. *Papagno*, 639 F.3d at 1096. The MVRA applies to only certain offenses "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss," 18 U.S.C. § 3663A(c)(1)(B), such as a "crime of violence," § 3663A(c)(1)(A)(i), or "an offense against property … including any offense committed by fraud or deceit," § 3663A(c)(1)(A)(ii). *See Fair*, 699 F.3d at 512 (citation omitted). The applicable procedures for restitution orders issued and enforced under these two statutes is found in 18 U.S.C. § 3664. *See* 18 U.S.C. § 3556 (directing that sentencing court "shall" impose restitution under the MVRA, "may" impose restitution under the VWPA, and "shall" use the procedures set out in Section 3664).

Both [t]he VWPA and MVRA require identification of a victim, defined in both statutes as "a person directly and proximately harmed as a result of" the offense of conviction. *Hughey v. United States*, 495 U.S. 411, 418 (1990) (interpreting the VWPA). Both statutes identify similar covered costs, including lost property and certain expenses of recovering from bodily injury. *See Papagno*, 639 F.3d at 1097-97; 18 U.S.C. §§ 3663(b), 3663A(b). Finally, under both the statutes, the government bears the burden by a preponderance of the evidence to establish the amount of loss suffered by the victim. *United States v. Bikundi*, 926 F.3d 761, 791 (D.C. Cir. 2019).

 In deciding whether to impose restitution under the VWPA, the sentencing court must

take account of the victim's losses, the defendant's financial resources, and "such other factors as the court deems appropriate." *United States v. Williams*, 353 F. Supp. 3d 14, 23-24 (D.D.C. 2019) (quoting 18 U.S.C. § 3663(a)(1)(B)(i)). The MVRA, by contrast, requires imposition of full restitution without respect to a defendant's ability to pay.[4]

Because this case involves the related criminal conduct of hundreds of defendants, the Court has discretion to: (1) hold the defendants jointly and severally liable for the full amount of restitution owed to the victim(s), *see* 18 U.S.C. § 3664(f)(1)(A)(requiring that, for restitution imposed under § 3663, "the court shall order restitution to each victim in the full amount of each victim's losses as determined by the court and without consideration of the economic circumstances of the defendant"); or (2) apportion restitution and hold the defendant and other defendants responsible only for each defendant's individual contribution to the victim's total losses, 18 U.S.C. § 3664(h). That latter approach is appropriate here.

More specifically, the Court should require Price to pay $500 in restitution for his convictions on Counts One through Four. This amount fairly reflects Price's role in the offense and the damages resulting from his conduct. Moreover, in cases where the parties have entered into a guilty plea agreement, five hundred dollars has consistently been the agreed upon amount of restitution and the amount of restitution imposed by judges of this Court where the defendant was convicted of only misdemeanors and not directly and personally involved in damaging property. Accordingly, such a restitution order avoids sentencing disparity.

---

[4] Both statutes permit the sentencing court to decline to impose restitution where doing so will "complicat[e]" or "prolong[]" the sentencing process. *See* 18 U.S.C. §§ 3663(a)(1)(B)(ii), 3663A(c)(3)(B).

## VII.  Fine

The defendant's convictions subject him to a statutory maximum fine of $100,000. 18 U.S.C. § 3571(b). In determining whether to impose a fine, the sentencing court should consider the defendant's income, earning capacity, and financial resources. *See* 18 U.S.C. § 3572(a)(1); U.S.S.G. § 5E1.2(d). In assessing a defendant's income and earning capacity, a sentencing court properly considers whether a defendant can or has sought to "capitalize" on a crime that "intrigue[s]" the "American public." *United States v. Seale*, 20 F.3d 1279, 1284-86 (3d Cir. 1994).

A fine is appropriate in this case. The defendant has jointly raised with his co-defendant $33,752 on a crowdsourcing fundraising platform, with net earnings of $31,613. *See* PSR ¶ 65; *see also* PSR ¶ 87.  As the final PSR notes, the campaign page indicates that the defendant and his wife were "investigated and unfairly charged," emphasizing that they were treated like "hardened criminals" despite being peaceful and not engaging in violence at the Capitol. Defendant Price confirmed that he and his wife's objective is to earn money for their cause.

## VIII.  Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence Price to six months of incarceration, at the low end of the Guidelines range calculated by the government, twelve months of supervised release, a fine, and $500 in restitution. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on his liberty as a consequence of his behavior.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By: /s/ Ashley Akers
Trial Attorney
MO Bar No. 69601
Detailed to the U.S. Attorney's Office
601 D Street NW
Washington, DC 20001
(202) 353-0521
Ashley.Akers@usdoj.gov

/s/ Andrew Haag
ANDREW S. HAAG
Assistant United States Attorney
MA Bar No. 705425
601 D Street, N.W.
Washington, DC 20530
(202) 252-7755
Andrew.Haag@usdoj.gov